IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MICHAEL KEARNEY, | : | |
| | : | |
| *Plaintiff*, | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| IRONRIDGE, INC., et al., | : | NO. 23-4505 |
| | : | |
| *Defendants.* | : | |

**MEMORANDUM**

**KENNEY, J.**                                                                                               **MAY 14, 2024**

### I.     INTRODUCTION

Plaintiff Michael Kearney brought claims against his former employer, IronRidge, Inc., ("IronRidge") and individual defendants Rich Tiu, Sean McDonald, and Kelley Thumati under the Americans with Disabilities Act ("ADA"), the Age Discrimination in Employment Act ("ADEA"), and the Pennsylvania Human Relations Act ("PHRA"). IronRidge moved to compel arbitration and dismiss the case, pursuant to an arbitration agreement Kearney signed when he commenced employment there. Kearney opposes the motion, which is ripe for review.

### II.    FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Michael Kearney began working for IronRidge in July 2011 as the Director of Sales. ECF No. 1 ¶ 18. In 2022, Kearney alleges that he was promoted to Vice President of Business Development, and had received glowing reviews from his supervisors throughout his time at IronRidge. *Id.* ¶¶ 22-25. In April 2022, Kearney (who had a hearing impairment) informed his supervisors that his hearing impairment was worsening. *Id.* ¶¶ 27-28. Kearney alleges that his supervisors took no action to engage in the interactive process regarding his disability, and instead limited his job responsibilities, reduced his pay, and "marginaliz[ed] him from his peers and

colleagues." *Id.* ¶ 31. Kearney also alleges that defendants made inappropriate comments about his age (he was 57 when this lawsuit was initiated). *Id.* ¶¶ 4, 34-37. Ultimately, Kearney was fired on September 14, 2022. *Id.* ¶ 42.

Kearney dual-filed a complaint with the Pennsylvania Human Relations Commission and the United States Equal Employment Opportunity Commission on September 23, 2022. *Id.* ¶ 16. He then initiated this action on November 15, 2023. *Id.* at 16. On January 8, 2024, Defendants filed a Motion to Compel Arbitration and Dismiss the Case (ECF No. 11), which Kearney opposed (ECF No. 12). The Court determined that under the applicable law, the parties needed to conduct limited discovery on the issue of arbitrability, and so ordered. ECF No. 13. Per the Court's Order, the parties filed a Joint Statement of Stipulated Facts (ECF No. 16), followed by Defendants' Response to Plaintiff's Motion (ECF No. 17) and Plaintiff's Sur-reply Brief in Opposition to Defendant's Response (ECF No. 18).

The parties' Joint Statement of Stipulated Facts disclosed that Kearney signed the arbitration agreement on July 6, 2011, but no Defendants ever sent him a fully-executed copy of the agreement until December 12, 2023. ECF No. 16 ¶¶ 3, 5-7. The arbitration agreement was signed by Sarah Chivers, an IronRidge employee who only began working there in 2014. *Id.* ¶¶ 8-13.

### III.   STANDARD OF REVIEW

As explained in the Court's January 29, 2024 Order (ECF No. 13), a motion to compel arbitration may be evaluated under either the motion to dismiss standard of Rule 12(b)(6) or the summary judgment standard of Rule 56. *See Guidotti v. Legal Helpers Debt Resol., L.L.C.*, 716 F.3d 764, 776 (3d Cir. 2013). If it is "apparent, based on the face of a complaint, and documents relied upon in the complaint, that certain of a party's claims are subject to an enforceable

arbitration clause, a motion to compel arbitration should be considered under a Rule 12(b)(6) standard." *Id.* (citation and quotation omitted). "But if the complaint and its supporting documents are unclear regarding the agreement to arbitrate, or if the plaintiff has responded to a motion to compel arbitration with additional facts sufficient to place the agreement to arbitrate in issue, then the parties should be entitled to discovery on the question of arbitrability before a court entertains further briefing on [the] question." *Id.* (alteration in original). "After limited discovery, the court may entertain a renewed motion to compel arbitration, this time judging the motion under a summary judgment standard." *Id.*

In this case, Defendants initially filed a motion to dismiss and compel arbitration in January 2024. Given that it was not clear from the face of the complaint or the documents relied upon in the complaint whether the suit was subject to arbitration, in accordance with *Guidotti*, the parties were given an opportunity to engage in limited discovery on the question of arbitrability. That discovery has now been had and Defendants have renewed their motions to compel arbitration, which shall be evaluated under a summary judgment standard.

Under the applicable summary judgment standard, "a motion to compel arbitration should only be granted if there is no genuine dispute as to any material fact and, after viewing facts and drawing inferences in favor of the non-moving party, the party moving to compel is entitled to judgment as a matter of law." *White v. Sunoco, Inc.*, 870 F.3d 257, 262 (3d Cir. 2017).

IV.     **DISCUSSION**

Kearney argues that the gap in time between each party signing the arbitration agreement meant that there was never a meeting of the minds sufficient to form a contract, and that Defendants did not provide adequate consideration to form a new contract in 2014. ECF No. 18 at 4-11. Defendants contend that Plaintiff manifested his intent to be bound by signing the agreement and

continuing to work at IronRidge. ECF No. 17 at 6-12.

"The Federal Arbitration Act . . . establishes a national policy favoring arbitration when the parties contract for that mode of dispute resolution." *Preston v. Ferrer*, 552 U.S. 346, 349 (2008). However, "a party cannot be compelled to submit a dispute to arbitration unless it has agreed to do so." *Century Indem. Co. v. Certain Underwriters at Lloyd's London*, 584 F.3d 513, 524 (3d Cir. 2009). Accordingly, "a judicial mandate to arbitrate must be predicated upon the parties' consent." *Guidotti*, 716 F.3d at 771 (citation and quotation omitted). In determining whether there is a valid agreement to arbitrate, courts turn to "ordinary state-law principles that govern the formation of contracts." *Kirleis v. Dickie, McCamey & Chilcote, P.C.*, 560 F.3d 156, 160 (3d Cir. 2009) (quoting *First Options of Chic., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995)). Under Pennsylvania law, a valid contract requires: "(1) a mutual manifestation of an intention to be bound, (2) terms sufficiently definite to be enforced, and (3) consideration." *Id*. (citation omitted); *see also Johnston the Florist, Inc. v. TEDCO Const. Corp.*, 657 A.2d 511, 516 (Pa. Super. Ct. 1995).

For a contract to be valid, generally "signatures are not required unless such signing is expressly required by law or by the intent of the parties." *Shovel Transfer and Storage, Inc. v. Penn. Liquor Control Bd.*, 739 A.2d 133, 136 (Pa. 1999) (citation omitted). The intent of the parties can be inferred if the "agreement herein expressly required the signatures of both parties." *Bair v. Manor Care of Elizabethtown, PA, LLC*, 108 A.3d 94, 98 (Pa. Super. Ct. 2015).

Pennsylvania courts have routinely found that express language requiring the agreement to be signed by both parties is indeed binding. For example, in *Shank v. Fiserv, Inc.*, 2016 WL 161902, at *3 (E.D. Pa. Jan. 14, 2016), the agreement at issue contained language stating that "in utilizing [the arbitration] process and signing this agreement, the employee and the Company

relinquish all rights to pursuing through the court the claims covered by this agreement." Since the defendant in *Shank* had not signed the agreement, the Court found it to be unenforceable given that language. *Id.* at *4. *See also Buzzmarketing, LLC v. Upper Deck Co., LLC*, 2004 WL 966241, at *3 (E.D. Pa. May 5, 2004) ("[B]y describing the manner in which 'signatures shall suffice' to 'execute []' the agreement, this clause clearly indicates the parties' intent to execute the agreement only by signing it."); *Shovel Transfer*, 739 A.2d at 138 ("[I]t is firmly settled that the intent of the parties to a written contract is contained in the writing itself. When the words of a contract are clear and unambiguous, the intent is to be found only in the express language of the agreement." (citations omitted)).

Kearney's argument largely hinges upon the circumstances surrounding IronRidge's countersigning of the arbitration agreement. Kearney began working at IronRidge in "early July 2011" and signed the Employee Arbitration Agreement on July 6, 2011. ECF No. 16 ¶¶ 1, 3. The arbitration agreement was not counter-signed by IronRidge until at least 2014. *Id.* ¶¶ 8-10. The arbitration agreement at issue contains a paragraph just above the signature lines that is written in bold and all-caps stating:

> **NOTICE: BY SIGNING THIS ARBITRATION AGREEMENT, EMPLOYEE AND COMPANY ARE AGREEING TO HAVE ANY ISSUE ARISING OUT OF THEIR EMPLOYMENT RELATIONSHIP DECIDED BY NEUTRAL ARBITRATION, AND BOTH EMPLOYEE AND COMPANY ARE GIVING UP THEIR RIGHT OF APPEAL AND THEIR CONSTITUTIONAL RIGHT TO A JURY OR COURT TRIAL.**

ECF No. 16, Ex. A at 2. The first two clauses of that paragraph clearly indicate that both the employee and the company are required to sign the contract for it to go into effect. *See Shank*, 2016 WL 161902, at *3. By its own terms, the contract was not effective until it was signed, and it is undisputed that the contract was not signed by the company until at least 2014. *See* ECF No. 16 ¶¶ 7-13. Between 2011 and 2014 then, there was no enforceable contract; IronRidge had not manifested an intent to be bound by the contract since it had not signed the contract per the terms

of the contract itself. *See Franklin Interiors v. Wall of Fame Mgmt. Co., Inc.*, 511 A.2d 761, 762 (Pa. 1986) ("[T]he formation of a valid contract was expressly conditioned upon the written approval of Appellee . . . [who] never entered its signature on the document to evidence approval as required by its terms. This is clearly a facial defect . . . .").

IronRidge argues that even if the contract was not valid upon Kearney's signing in 2011, no new consideration was required when they signed the contract in 2014 since Kearney's continued employment served as consideration. ECF No. 17 at 8-9. However, under these circumstances, new consideration was required in order to form a meeting of the minds in 2014 and form a valid contract. In *Socko v. Mid-Atl. Sys. Of CPA, Inc.*, 126 A.3d 1266, 1275 (Pa. 2015), the Pennsylvania Supreme Court held that continued employment was insufficient consideration to support a non-competition clause that was imposed after the employee had begun employment, and instead required a benefit such as "a promotion, a change from part-time to full-time employment, or even a change to a compensation package. . . ." Although non-compete clauses are substantially more disfavored than arbitration clauses, a recent case in this district applied the reasoning in *Socko* to arbitration agreements, and concluded that such agreements that were proposed even a week after the employee started work required additional consideration to be enforceable. *See Crump v. MetaSource Acquisitions, LLC*, 373 F. Supp. 3d 540, 549 (E.D. Pa. 2019). Similarly, a contract signed three years after the employee initially signed it required additional consideration to form a meeting of the minds in 2014.

The issue being decided by the Court turns on the absence of a signature by the drafting party, a detail which may seem overly formalistic. Yet the legal formalities here are important guideposts in evaluating whether there has been a meeting of the minds and a present, current acceptance of the terms of the agreement by all parties. Without its signature on the arbitration

agreement, IronRidge could easily argue that it never assented to the contract, according to its terms, and thereby escape from mandatory arbitration if it so chose. Interpreting the words of the contract as written prevents the possibility of employers using "contract[s] as both a sword and shield," going to arbitration or federal court as it suits them. *Aircraft Braking Sys. Corp. v. UAW Loc. 856*, 1993 WL 809782, at *2 (N.D. Ohio May 14, 1993). Plaintiff is not alleging that IronRidge has done so in this case, but enforcing the contract as written precludes the possibility altogether.[1]

## V.     CONCLUSION

Per its own terms, the arbitration agreement was unenforceable until signed by both parties, and the gap in time between each party signing it necessitated additional consideration to be effective. Therefore, there is no valid contract to arbitrate the claims in this case. Defendant's Motion to Dismiss and Compel Arbitration is **DENIED**. An appropriate Order will follow.

BY THE COURT:

/s/ Chad F. Kenney
_____
**CHAD F. KENNEY, JUDGE**

---

[1] Since the Court has found that there was never a valid arbitration contract, there is no need to address the parties' waiver argument.